**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY, and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 6, 2015**

# In the Court of Appeals of Georgia

A15A0424. BOWMAN v. THE STATE.

BARNES, Presiding Judge.

A jury convicted Robert Bowman on two counts of aggravated child molestation, two counts of aggravated sodomy, two counts of aggravated sexual battery, six counts of child molestation, and two counts of cruelty to children in the first degree. Following the denial of his motion for new trial, Bowman appeals. Bowman contends that the evidence was insufficient to sustain the verdict and that the trial court erred in admitting hearsay statements, in allowing a witness to comment on the victim's veracity, and in denying his request to charge the jury regarding mandatory minimum sentences. For the reasons that follow, we affirm.

Viewed in the light most favorable to the jury's verdict, the evidence showed that the victim, who was six at the time, disappeared one day. Her father, who lived nearby and joined her mother in the search, finally found her in Bowman's apartment sitting on the floor, and her father "got onto her" because she was not supposed to go

into anyone else's house. Bowman, who was a friend and neighbor, usually kept his door open, but that day it had been closed, which was unusual. The mother recalled seeing the victim come out of Bowman's house on a previous occasion.

About a month later, while Bowman was giving the victim and her mother a ride home from the grocery store, he asked if they would like to go to breakfast with him the next morning. The victim "just kind of snapped" and said no, she did not want to go. Her mother chastised her for being rude, but several hours after that, the victim told her mother that she did not like Bowman because he "messed with her." The victim told her mother that he took her into his bedroom, licked her breasts, her private parts, and her bottom, and inserted his finger into her "pussy" and "it hurt real bad."

An expert in forensic interviewing and child sexual abuse interviewed the victim, and the State played a recording of the interview at trial. In it, the victim said that she had two interactions with Bowman in the bedroom of his apartment during which he kept "messing with" her. She said that on both occasions, he licked her private area, which he told her to call her "pussy," and licked her breasts, which he told her to call her "boobs." He also put his hands on her breast, inserted his finger into her vagina, stuck his "wicky wacker" in "there," and pulled down his pants and

2

"squeezed it," demonstrating with her hands in front of her pelvis. Then he asked, "Can I see yours?" He said he would show her what he and his girlfriend did and put her on his lap, facing him, while he bounced up and down. Bowman told the victim that she could go outside any time she wanted, but his door was locked and he would not let her leave, although both times she kept telling him to stop. He told her that the next time she came around, when her mother was not around, she would have to suck on his privates, and also told her not to tell anyone what had happened." The victim described Bowman's bedroom, and that description was corroborated upon execution of a search warrant.

After Bowman was arrested, he waived his *Miranda* rights and talked to the lead investigator in the sheriff's department. When the investigator suggested that "maybe it just happened," Bowman replied,

> If I did touch her, maybe it was an accident.... If I did touch her the wrong way — it was an accident.... If I touched her in the wrong way without my knowledge, then yeah I am sorry.... I went to pick her up several times right around her back and my hand slipped — could've slipped. Could she have been talking about that? ... If I touched her in the wrong way — my hand could have slipped and touched her on the chest [by] accident.

Later in the interview, Bowman repeated, "Like I told you — if I touched her any []

way, or said anything bad in front of her — it was an accident."

1. Bowman argues that the evidence was insufficient to sustain his convictions,

but he does not argue that the State failed to prove specific charges against him.

Rather, he argues generally that the State failed to prove his guilt beyond a reasonable

doubt. After reviewing the trial testimony in detail, Bowman observes that the victim

made an outcry several months after the first act, that she made conflicting

statements, and that she used different terms and descriptions depending on who she

was talking to at the time. He further notes that there are innocent explanations for

some of the evidence, such as the coloring books, toys, and popsicles that the State

argued he used to lure the victim into his apartment, and for the victim's behavior that

her counselor testified were consistent with a child who was sexually abused.

In support of his proposition that "the reviewing court is not bound to blindly

accept any and every finding of the trier of fact" and that the court may hold that a

witness's testimony may be accorded no value in certain cases, Bowman cites

*Brandon v. State*, 241 Ga. App. 887, 889 (2) (2000). In *Brandon*, however, we

reversed a conviction based on an improper charge that "juries are not bound to

believe testimony as to facts incredible, impossible or inherently improbable." Id. at

4

888-889 (2). Such a charge "applies in only extraordinary cases, and only for statements which run contrary to natural law and the universal experience of mankind." (Citation and punctuation omitted.) Id. at 889 (2). This is not such a case.

It is axiomatic that the testimony of a single witness is sufficient to prove the elements of the crime charged. See former OCGA § 24-4-8.[1] *Hammontree v. State*, 283 Ga. App. 736, 737 (1) (642 SE2d 412) (2007). "This rule is often applicable to child molestation cases where, as here, the victim and the defendant are the only people present when the alleged molestation occurs." *Johnson v. State*, 328 Ga. App. 808, 812 (762 SE2d 813) (2014).

> In any event, it is the jury's role to resolve conflicts in the evidence and determine the credibility of witnesses, and the presence of such conflicts does not render the evidence insufficient. When a criminal defendant challenges the sufficiency of the evidence supporting his conviction, we view the evidence in the light most favorable to the verdict. The relevant question for this court is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In answering this question, we as appellate judges do not put ourselves in the jury box and ask what verdict we would have returned had we been jurors. Rather, we uphold the jury's verdict as long as there is some

---

[1]This case was tried in January 2012, so the old Evidence Code is applicable.

5

competent evidence to support each element necessary to make out the state's case.

(Footnotes omitted.) *Malone v. State*, 277 Ga. App. 694, 696 (1) (627 SE2d 378) (2006).

The evidence was sufficient to authorize a rational trier of fact to conclude that appellant was guilty of the charges beyond a reasonable doubt. OCGA § 16-6-4 (a); *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979); *King v. State*, 265 Ga. 440 (458 SE2d 98) (1995).

2. Bowman contends that the trial court erred in admitting evidence of the victim's out-of-court statements. Former OCGA § 24-3-16 provided that

A statement made by a child under the age of 14 years describing any act of sexual contact or physical abuse performed with or on the child by another . . . is admissible in evidence by the testimony of the person or persons to whom made if the child is available to testify in the proceedings and the court finds that the circumstances of the statement provide sufficient indicia of reliability.[2]

The State has the burden of showing that the statements are reliable, and the trial court must determine whether that burden has been met. *Ferreri v. State*, 267 Ga.

---

[2]Former OCGA § 24-3-16 was reenacted almost verbatim in the new Evidence Code at OCGA § 24-8-820.

App. 811, 814 (600 SE2d 793) (2004). "Indicia of reliability must spring from the circumstances of the statement," and we have enumerated various factors that can be considered in determining the admissibility of a victim's out-of-court statements. *Gregg v. State*, 201 Ga. App. 238, 240-241 (3) (b) (411 SE2d 65) (1991). Further, evidence of reliability need not be presented solely pre-trial, but may also include evidence presented during trial. Id. at 239-240 (3) (a).

Here, the trial court considered in a pre-trial hearing the hearsay statements made to the forensic interviewer, to a counselor, in group therapy, and to the victim's mother, father, and aunt. The court found that the statements appeared to be fairly spontaneous, without coaching, and had sufficient indicia of reliability to permit their introduction, although the court also noted that if evidence of coaching or untruthfulness arose during trial, it would reconsider. Bowman alleges that there were inconsistencies in the victim's statements as well as indications she had been coached, but these arguments are unpersuasive, as the record contains evidence supporting the finding that the statements had sufficient indicia of reliability. Thus, we find no error in the trial court's admission of the statements. See *Adams v. State*, 288 Ga. 695, 702 (5) (707 SE2d 359) (2011).

7

3. Bowman argues that the trial court erred in allowing testimony regarding the victim's veracity, specifically in allowing the expert in forensic interviewing techniques to testify that the victim was "resistant to suggestibility." Bowman contends that whether the victim was resistant to suggestibility was a credibility issue that was not beyond the ken of the average layperson and not a proper topic for an expert's opinion.

"The credibility of a witness is a matter to be determined by the jury under proper instructions from the court." Former OCGA § 24-9-80.[3] An expert witness's opinion testimony that a victim was telling the truth constitutes improper bolstering, "because that is an ultimate issue of fact and the inference to be drawn is not beyond the ken of the average juror." *Al-Attawy v. State*, 289 Ga. App. 570, 572 (1) (657 SE2d 552) (2008). An expert may testify, however, about her objective observation of the victim's behavior and whether it is generally consistent with that of someone who has been molested. *Thomas v. State*, 318 Ga. App. 849, 855 (4) (b) (734 SE2d 823) (2012); *Brown v. State*, 293 Ga. App. 633, 636 (1) (c) (667 SE2d 899) (2008).

---

[3]The new Evidence Code provides, "The credibility of a witness shall be a matter to be determined by the trier of fact, and if the case is being heard by a jury, the court shall give the jury proper instructions as to the credibility of a witness." OCGA § 24-6-620.

8

The expert explained that a forensic interview was "an unbiased conversation that the interviewer has with a child in which it allows the child to discuss what may or may not have happened in their experience," conducted in a child-friendly environment. According to the expert, the interviewer aspires to be free of bias and non-judgmental when meeting with the child, and avoids learning anything about the circumstances that led to the child being interviewed. The expert also explained that a child of the victim's age, six, was expected to tell the interviewer "who was there, what happened, and where," although not necessarily time frames or frequencies. As further explained by the expert, the interviewer looks for age-appropriate language, inappropriate sexual knowledge, peripheral and sensory details, coaching, and consistency in the information the child imparts throughout the interview. Additionally, the expert noted, the interviewer considers whether a child is resistant to suggestibility.

If a person is "suggestible," she has a memory that is suggested by information and misinformation, and children under ten are highly suggestible, the expert said. She further related that

> to prevent suggestibility, ... you avoid leading questions. You also look
> when a child clarifies or corrects the interviewer. That's resistance to

suggestibility. [Their answers are] not being suggested by information that I am providing, that I am giving to a child or someone else will give to a child.... [I]f I make a mistake and the child corrects me, that is an example of resistance to suggestibility.

The expert testified that some indications that the victim was resistant to suggestibility were her asking what a "doodle" was when the expert told her she could doodle with crayons while they talked; answering "no" when asked if there was something she did not like to do instead of making something up; clarifying who the expert was talking about when the expert asked, "Who is he?"; and responding "no" when asked if she knew the name of Bowden's girlfriend or whether she said anything when the defendant pulled down his pants and held his "wicky whacker" (a term for penis she learned from a friend).

The expert's responses as described above were not statements about whether, in the expert's opinion, the victim had been molested or not. See *Bunn v. State*, 307 Ga. App. 381, 386 (3) (e) (705 SE2d 180) (2010), aff'd, 291 Ga. 183 (728 SE2d 569) (2012) (expert testimony that victim having corrected a mistake in earlier statement was good because it indicated the victim's resistance to suggestibility was not improper opinion that victim had been molested). Thus, the trial court did not err in overruling Bowman's objection to the expert's testimony in this regard.

10

4. Finally, Bowman argues that the trial court erred in declining to give his request to charge the jury that the offenses of aggravated sodomy, aggravated child molestation, and aggravated sexual battery each carry a mandatory minimum of 25 years in prison without the possibility of parole, followed by probation for life. During the charge conference, the trial court observed that it no longer charged the jury that sentencing was completely within the province of the court, which formerly was a proper charge, but declined to give the requested charge. Bowman renewed his objection after the trial court gave the jury charge.

Bowman argues on appeal that the Georgia Constitution decrees that "[i]n criminal cases ... the jury shall be the judges of the law and the facts," Art. I, Sec. I, Par. II, and absent any instruction about sentencing, the jury would naturally conclude that sentencing is a function for the court. But, he notes, when the legislature imposes mandatory minimum sentences upon conviction for certain offenses, sentencing ceases being a court function and becomes a legislative one.

Georgia has some precedent for telling the jury what will happen to a defendant if the jury reaches a particular verdict. If an accused defends against a criminal charge by pleading not guilty by reason of insanity, the trial court is required upon request to charge the jury that what will happen to the defendant if it finds him not guilty by

11

reason of insanity, guilty but mentally ill, or guilty but mentally retarded. OCGA §

17-7-131 (b) (3). "It is clear that the purpose of OCGA § 17-7-131 (b) (3) ... is to

ensure that the jury understands that a verdict of guilty but mentally ill does not mean

that the defendant will be released." *Spraggins v. State*, 258 Ga. 32, 34 (3) (364 SE2d

861) (1988). "Moreover, the failure to advise the jury of the consequences of

rendering either of these verdicts in accordance with [the statute] is presumptively

harmful." *Foster v. State*, 283 Ga. 47, 49 (2) (656 SE2d 838) (2008).

Bowman argues,

The Georgia legislature has seen fit to take the sentencing function out of the hands of the judiciary for certain offenses, disallowing any consideration for the individual circumstances of the accused. The legislature has also increased the mandatory minimums in several of these offenses from 10 years with no parole to 25 years with no parole. Middle-aged defendants, for all intents and purposes, receive a life sentence when receiving a 25-year unparolable sentence. For a jury not to be informed of the consequences of their verdicts in cases where there are mandatory minimum sentences flied in the face of the Due Process Clause of the U. S. Constitution (Amendment 14) and the Constitution of the State of Georgia, Art. I, Sec. I, Par. II.

As the State argues in response, however, other than OCGA § 17-7-131 (b)

(3)'s "limited exception to the general rule proscribing consideration of the

consequences of a guilty verdict," *State v. Patillo*, 262 Ga. 259, 260 (417 SE2d 139) (1992), our Supreme Court has held that "[i]t is improper for the court to give any instruction to the jury concerning possible sentences in a felony case before the jury has determined the question of guilt or innocence." (Citation and punctuation omitted.) *Bellamy v. State*, 272 Ga. 157, 159 (4) (527 SE2d 867) (2000). See also *Stinski v. State*, 286 Ga. 839, 848 (36) (691 SE2d 854) (2010) ("The trial court did not err by refusing to charge the jury at the beginning of the guilt/innocence phase regarding the procedures to be followed in the sentencing phase.").

As this court is "constitutionally bound by the decisions of our own Supreme Court," *Williamson v. Ward*, 192 Ga. App. 857, 858 (1) (386 SE2d 727) (1989), this enumeration cannot succeed. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. VI ("The decisions of the Supreme Court shall bind all other courts as precedents.").

*Judgment affirmed. Ray and McMillian, JJ., concur.*